Filed 1/30/26  Tarkington v. Cal. Victim Compensation Bd. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CANELIA TARKINGTON et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CALIFORNIA VICTIM COMPENSATION BOARD, <br><br> Defendant and Respondent; <br><br> STATE OF CALIFORNIA, <br><br> Real Party in Interest and Respondent. | B339185 <br><br> (Los Angeles County Super. Ct. No. 22STCP03783) |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen I. Goorvitch, and Mitchell Beckloff, Judges.  Affirmed.

Law Office of Tony Su and Tony Su for Plaintiffs and Appellants Canelia Tarkington and LaMont Tarkington (Deceased).

Rob Bonta, Attorney General, Iveta Ovsepyan, Assistant Attorney General, Catherine Woodbridge, Molly S. Murphy, Clair Leonard and Michael Gasbarro, Deputy Attorneys General, for Defendant and Respondent California Victim Compensation Board.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Kathryn L. Althizer and Dina Petrushenko, Deputy Attorneys General, for Real Party in Interest and Respondent State of California.

_____

LaMont Tarkington spent over 12 years in state prison following convictions for robbery. The Court of Appeal reversed those convictions on a writ of habeas corpus and, during retrial, the trial court dismissed all charges for failure to timely prosecute. Tarkington applied to respondent California Victim Compensation Board (the Board) seeking Penal Code section 4900[1] compensation for his time in custody. The Board denied the application. Tarkington (now deceased) and his surviving widow Canelia Tarkington[2] filed a petition for

---

[1] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

[2] We use the surname "Tarkington" to refer to LaMont Tarkington. We refer to Canelia Tarkington by her full name, and to both LaMont Tarkington and Canelia Tarkington collectively as "appellants."

2

administrative writ of mandamus challenging the Board's decision. They now appeal the court's denial of that petition.

We are unpersuaded by appellants' argument that the Board applied an incorrect burden of proof. Consistent with the applicable version of section 4900, before denying Tarkington's application, the Board required the Attorney General of the State of California (the AG) to prove by clear and convincing evidence that Tarkington had committed the robbery. Substantial evidence supports the Board's conclusion that the AG met this burden. We also reject Tarkington's assertion that the Board failed to accept findings from the habeas proceedings that section 4903 deems binding.

Accordingly, we affirm.

## BACKGROUND

### A. Trial

In 2007, the People charged Tarkington and his codefendant, Darris Allen, with robbing a Bank of America branch located in a grocery store in Palmdale.

### 1. *Prosecution Evidence at Trial*

During the jury trial that followed, witnesses testified that around 10:00 a.m. on December 14, 2005, three masked men entered the bank. One man's mask was a nylon stocking covering his face; all three robbers wore gloves. Two of the men jumped over the counter and took money from the tellers' drawers. The third robber remained in the lobby. One of the robbers used a walkie-talkie. The robbers took approximately $12,223 in bills and coins. Some of the bills contained "bank dye packs" that explode and spray red dye.

3

At approximately 9:00 p.m., following a routine traffic stop, sheriff's department deputies detained Tarkington and Allen approximately 60 to 70 miles from the bank. Allen was in the driver's seat and Tarkington in the front passenger seat. Tarkington gave deputies a driver's license with a false name. The deputies searched the vehicle in the dark using flashlights and found a bag containing approximately $3,138 in bills that were moist, red-stained, and smelled like bleach. Inside a jacket in the backseat, deputies found additional red-stained money that smelled like bleach. Serial numbers on bills found in Tarkington's vehicle matched those on the money stolen from the bank. Allen initially told the deputies he obtained the money by selling a stolen car; soon thereafter, Allen told them he obtained the money by selling marijuana. During subsequent interviews, he told law enforcement Tarkington had given him the money and instructed him to lie and say it was from selling a stolen car. Deputies retrieved $201 in red-stained bills that smelled like bleach from Tarkington's front pants pocket. Tarkington told police Allen had given him this money in exchange for a ride.

While taking inventory of Tarkington's vehicle at the police impound yard, Detective Lauren Brown found a "nylon stocking cap tied off at the top" containing about $59 in red-stained coins, a red-stained shirt and towel, a blue beanie, and photos of Tarkington "making gang signs." Forensic testing identified Allen's and other individuals' DNA on the stocking. Allen's fingerprints were found on the white Ford in which the robbers fled.

At both the preliminary hearing and trial, bank teller Christina Rissling described the robber in the lobby as a light-skinned black male wearing a dark-colored beanie. She identified

4

Allen as someone in the courtroom consistent with this description. She described one of the robbers who jumped over the counter and removed money from her drawer as a darker skinned black man who was taller and slimmer than the man in the lobby. She identified Tarkington as someone in the courtroom consistent with this description. Another teller, Yessenia Bahena, described the two robbers who jumped over the counter as black men with dark skin. Tarkington had a dark complexion, was 5 feet 11 inches tall, and weighed approximately 200 pounds at the time of the robbery.

The trial court admitted evidence of Tarkington's 1997 conviction for robbing a different Bank of America branch in Southern California, during which armed robbers used walkie-talkies and jumped over the counter.

Detective Brown testified that when a dye pack explodes, it releases both red dye and pepper spray. During his testimony, while handling the shirt and towel retrieved from Tarkington's car, Brown described a strong pepper spray odor emitting from them. The next day, the judge commented that he "was affected by" the strong odor as well.

### 2. *Defense Evidence*

A defense witness testified that at around 10:30–10:45 a.m. on the morning of the robbery he saw Tarkington at a recreation center. It takes at least 75 minutes to drive from the center to the bank.

Allen testified that he obtained the money found in Tarkington's vehicle from selling a stolen car, and that he gave Tarkington the $201 found in Tarkington's pants pocket as payment for Tarkington giving him a ride.

### 3.    *Judgment and Appeal*

The jury convicted Tarkington of robbery and commercial burglary.  The Court of Appeal affirmed the convictions, concluding that although the trial court erred in permitting evidence of Tarkington's prior robbery conviction and gang affiliation, these errors were not prejudicial.[3]

## B.    Habeas Proceedings

In 2017, the Court of Appeal granted Tarkington's habeas petition on the ground that his trial counsel had provided ineffective assistance.[4]

### 1.    *Evidence in Habeas Proceedings*

#### a.    *Trial counsel's testimony*

During the habeas hearing in the trial court, Tarkington's trial counsel testified that she did not have the red-stained shirt and towel tested for MAAQ, the chemical present in bank dye. Tarkington told her these items were in a pile of other clothes in the back of the vehicle and that the stains may have been

---

[3] The court did, however, dismiss the firearm and gang enhancements.

[4] This was Tarkington's second habeas petition. Tarkington filed his first petition with the superior court in 2015, arguing trial counsel's failure to obtain cell phone records to support his alibi constituted ineffective assistance of counsel. The court denied the petition after hearing.  Evidence presented during the hearing established the red-stained shirt and towel had never been tested for bank dye.  Tarkington filed a supplemental habeas petition with the Court of Appeal, this time arguing counsel's failure to have these items tested constituted ineffective assistance of counsel.

6

Gatorade.  Counsel testified that she "did not smell an overwhelming odor on [the items] when she handled [them] during closing argument, but she acknowledged [they] were not odorless."

At the superior court hearing, trial counsel testified that after she could not corroborate the alibi Tarkington first provided her, Tarkington offered a different alibi, which she presented on his behalf at trial.  Tarkington admitted to her that, the day before the robbery, he gave Allen a ride to the grocery store where the robbery took place, and Allen went inside and bought nylon stockings.  Tarkington dissuaded her from obtaining his cell phone records because he thought they might incriminate him.

### b.   *Tarkington's testimony and phone records*

At that same hearing, Tarkington denied much of his trial counsel's testimony.  He questioned the accuracy of cell phone records reflecting that Tarkington and Allen were in increasingly frequent contact leading up to the time of the robbery, and that neither made any calls during the robbery itself.  He maintained that location information from his cell phone records, had it been available, would have supported the alibi he presented at trial.  He attributed the stains on the white towel and shirt to cranberry juice.  He claimed he gave police a false name because he was on federal probation.

### c.   *Federal Bureau of Investigation evidence*

The Federal Bureau of Investigation (the FBI) as well as the Los Angeles County Sheriff's Department (sheriff's

7

department) investigated the robbery. Neither agency made witness statements from the FBI's investigation available to Tarkington until the habeas proceedings. In these statements, admitted into evidence at the habeas hearing, bank tellers' descriptions of the robbers were inconsistent with Tarkington's appearance in some respects. Teller Yolanda Moore said the robber who took money from her and Rissling's drawers was a black male with a dark complexion, like Tarkington's, but that he was approximately 5 feet 5 inches tall and weighed approximately 150 pounds with a medium build. Tarkington, however, stood "about 5 feet 11 inches tall," "[did] not have a medium build," and "weigh[ed] about 200 pounds" at the time of the robbery. Teller Bahena reported that one of the robbers who jumped over the counter had a dark complexion, but was 5 feet 8 inches to 5 feet 9 inches tall with a medium to thin build, weighing approximately 170 pounds.[5] Also, Rissling reported that the robbers who jumped over the counter were black men of medium build and complexion, approximately 5 feet 9 inches to 5 feet 10 inches tall, weighing 170 to 180 pounds.

The FBI agent in charge of investigating the robbery testified that "witnesses' descriptions can differ at bank robberies and often vary from reality due to the witnesses' perception . . . and the stress of the situation."

### d. *Forensic expert testimony*

Both the People and Tarkington commissioned expert forensic testing of the red-stained shirt and towel. The People's

---

[5] She did not specifically recall the other two men's appearance, except that they were black men who looked similar to the one she identified.

forensic expert testified that, although some of the currency found in the vehicle was exposed to MAAQ, he did not find MAAQ on the shirt or towel.  He further testified that washing fabric with water or bleach can remove any MAAQ.

Tarkington's expert likewise concluded there was no MAAQ on the towel and shirt.  He acknowledged he had not attempted to ascertain whether the currency may have been washed to remove any MAAQ.

### 2. *Decision Granting Habeas Petition (2017 Habeas Decision)*

The Court of Appeal granted the supplemental petition on the ground that Tarkington's trial counsel had provided ineffective assistance by failing to have the shirt and towel tested for MAAQ.  Given the "paucity of evidence" against Tarkington, because such testing could have undermined Brown's "greatly exaggerated" testimony regarding the smell of pepper spray, trial counsel's representation was ineffective and prejudicial.  The court, however, did not conclude Tarkington was innocent.  It remanded for a new trial at the district attorney's election.

### C. Retrial and Dismissal

On remand, the district attorney elected to retry Tarkington.  At the retrial, the court found that, in violation of a court order, the sheriff's department had failed to preserve three cell phones, transcripts of 911 calls, sheriff's department radio transmissions, three disposable cameras, and investigating detectives' "case file."  The court approved a jury instruction permitting the jury to assume the missing evidence would have favored Tarkington.  The court also approved an instruction requiring the jury to "reject" the sheriff's department's claim

that it had "released this evidence to the superior court," and to "consider this fact . . . in evaluating [Brown's] credibility."

After the ruling, the prosecution informed the court it was unable to proceed in light of the "potentially . . . fatal" jury instructions and Brown's unavailability to testify when the prosecution ran out of other witnesses. The court dismissed the case under section 1382 for failure to timely prosecute.

## D.     Application for Section 4900 Compensation

### 1.     *Legal Background*

When a "court has granted a writ of habeas corpus . . . and the charges were subsequently dismissed" (§ 4900, subd. (b)), the previously incarcerated writ petitioner may apply to receive compensation at a rate of $140 per day spent in custody (*id.*, § 4904, subd. (a)). Before 2022, section 4900 placed the burden on the petitioner to prove his entitlement thereto. (See former § 4900, subd. (b); Stats. 2021, ch. 490, § 3; § 4902, subd. (d); Stats. 2021, ch. 490, § 4.) As of January 1, 2022, however, section 4900 requires the Board to grant compensation "unless the [AG] [objects and] establishes" (§ 4900, subd. (b)) "by clear and convincing evidence that the claimant committed the acts constituting the offense"[6] (§ 4903, subd. (b); see § 4902, subd. (d)). The Board may only deny a section 4900, subdivision (b) claim if "the overall weight of evidence, which may include the trial record only in combination with other admissible evidence, satisfies the [AG's] burden of proof." (Cal. Code Regs., tit. 2,

_____

[6] Tarkington's section 4900 claim was still pending in 2022 when these amendments took effect. In early 2022, all parties and the Board agreed that the newly amended version of the law applied to Tarkington's application.

10

§ 645, subd. (c); see § 4903, subd. (d) [the AG "may not rely solely on the trial record to establish" claimant's ineligibility].)

At a section 4900 hearing, the Board may consider all reasonably reliable evidence it deems relevant, even if that evidence would not have been admissible at trial. (Cal. Code Regs., tit. 2, § 641, subds. (c)–(f).) The Board enjoys broad discretion to evaluate the entire administrative record and draw its own conclusions about the relative weight of the evidence. (See § 4904; Cal. Code Regs., tit. 2, § 641, subd. (f); see also *Gonzales v. California Victim Compensation Bd.* (2023) 98 Cal.App.5th 427, 445 (*Gonzales*).) In exercising its discretion, "factual findings and credibility determinations" of a court in granting the underlying writ of habeas corpus (the habeas court) are binding on the AG and the Board. (§ 4903, subd. (c).)

## 2. *Hearing on Tarkington's Section 4900 Application*

The AG supported its objection to Tarkington's section 4900 petition with 50 exhibits, "including the trial record and transcripts from the habeas proceedings." Tarkington submitted a declaration in which Allen admits—contrary to his trial testimony—that he committed the robbery and denies Tarkington was involved. Tarkington also submitted expert testimony opining that shoe impressions at the bank from the time of the robbery did not match the shoes Tarkington and Allen wore when arrested. Tarkington did not testify.

On July 25, 2022, the Board denied Tarkington's claim. In an over 70-page decision, the Board expressly acknowledged that the current version of section 4900 applied and accepted as binding several conclusions in the 2017 habeas decision favorable

11

to Tarkington.  It nonetheless concluded the AG had met its burden under section 4900.  We agree.

The Board explained its decision as follows:

Law enforcement found red-stained bills in Tarkington's vehicle 11 hours after the robbery.  Some of these bore serial numbers directly linking them to the robbery and/or tested positive for bank dye.  The condition of the currency also suggested it had been washed in an attempt to remove the dye.  Tarkington had red-stained bills on his person that likewise appeared to have been washed.  A nylon stocking containing red-stained coins was found in Tarkington's car.  According to trial counsel's testimony and cell phone records, Tarkington engaged in suspicious behavior consistent with his involvement in the robbery.  This behavior included Tarkington changing his alibi, driving to the bank with Allen the day before the robbery, and the timing of phone contact between Allen and Tarkington on the day of the robbery.  During a search at the impounding facility, Brown found a beanie in Tarkington's car.  Although the Board acknowledged that nothing directly tied this particular beanie to the robbery, it was nevertheless a "striking coincidence" that a robber had worn a beanie and that one was found in Tarkington's car.  Finally, "an eyewitness described and identified Tarkington as one of the robbers."

The Board discussed in detail, and ultimately found unpersuasive, the evidence Tarkington deemed exculpatory.  In so doing, the Board acknowledged inconsistencies between Tarkington's appearance and tellers' descriptions of the robbers in FBI witness statements but concluded they were not so "stark as to raise a serious concern [the robber] must be a different person."  The Board found unpersuasive Tarkington's arguments

that Brown had planted items in his car after the sheriff's department impounded it. The Board deemed it more likely the deputies did not find these items earlier because they performed their initial search in the dark and did not necessarily know what to look for. The Board likewise rejected the lack of Tarkington's DNA on the nylon stocking as a basis for skepticism, given that the robbers wore gloves, and thus may have handled the stockings without depositing DNA.

Finally, the Board questioned Tarkington's and Allen's credibility as witnesses. The Board cited Allen's "multiple different accounts of how he obtained the money, his contrary trial testimony, and demonstrated willingness to lie." It noted Tarkington had a prior conviction involving moral turpitude, had made numerous inconsistent statements to law enforcement, and offered testimony during the habeas proceedings that was internally inconsistent. The Board also concluded Tarkington's "failure to take the stand, subject to cross examination [at the section 4900 hearing] . . . raises questions as to his veracity." Given these credibility assessments, the Board found Allen's declaration and Tarkington's testimony during the habeas proceedings did not explain away the red-stained bills or otherwise meaningfully undermine the AG's evidence.

### E. Administrative Writ and Instant Appeal

Appellants filed a petition for writ of administrative mandamus challenging the Board's denial. The superior court denied the petition. Appellants timely appealed. We affirm.

13

**DISCUSSION**

The instant appeal does not affect a fundamental right. (See *Tennison v. California Victim Compensation & Government Claims Board* (2007) 152 Cal.App.4th 1164, 1181–1182 (*Tennison*).) Therefore, in reviewing the denial of the writ, we "step into the trial court's shoes" and scrutinize the Board's decision using the same criteria a trial court must apply. (*Gonzales, supra*, 98 Cal.App.5th at p. 441.) We reverse where the agency decision reflects a "prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) This occurs when the agency "has not proceeded in the manner required by law, the . . . decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

Appellants challenge the Board's decision on two of these grounds. First, they argue the Board did not proceed in the manner sections 4900 and 4903 require, because it did not apply the correct burden of proof and did not give the requisite deference to the 2017 habeas decision. Second, they argue substantial evidence does not support the Board's findings.

Whether the agency proceeded as the law requires is a question of law we review de novo. (See *Gonzales, supra*, 98 Cal.App.5th at p. 441.) In reviewing a challenge to the sufficiency of the evidence, our task is to "deferentially evaluate whether the agency's findings are supported by substantial evidence." (*Ibid.*; see *Holmes v. California Victim Comp. & Government Claims Bd.* (2015) 239 Cal.App.4th 1400, 1406 (*Holmes*); *Tennison, supra,* 152 Cal.App.4th at p. 1182.)

14

### A. The Board Applied the Correct Burden of Proof

Appellants argue that, contrary to the 2022 amendments to section 4900, the Board "required Tarkington to carry the burden of proof." We disagree.

The Board expressly recognized the AG had the burden of proof, and the Board's analysis reflects its application of this burden. After evaluating the AG's evidence and concluding it supported Tarkington's guilt, the Board assessed whether Tarkington had presented evidence warranting a contrary conclusion. The Board decided he had not. In this context, the Board noted weaknesses and deficiencies in Tarkington's evidence. Such assessment does not reflect that the Board placed the burden of proof on Tarkington. Rather, it reflects the Board's weighing the totality of the evidence, as it must.

Appellants also incorrectly assert the AG's burden of proof required the Board to resolve conflicts in the evidence in Tarkington's favor and view the evidence in the light most favorable to Tarkington.[7] This argument confuses two distinct issues: how the Board chooses to weigh the evidence, and who has the burden of proof. How much weight to give evidence

---

[7] For example, appellants argue that because the Board relied on one teller's testimony that Tarkington looked like one of the robbers, but disregarded other tellers' statements to the FBI that he did not, it must have been placing the burden on Tarkington to prove his own innocence. Appellants similarly argue that the Board relied on the "striking coincidence" that police found a beanie in Tarkington's car, ignoring that no forensic evidence connected it to the robber's beanie, and that the color of the beanie may not exactly match the robber's.

was entirely in the Board's discretion as the trier of fact, as we discuss *post*. The Board applied the correct standard.

### B. The Board's Decision Is Consistent with the 2017 Habeas Decision

Appellants argue the Board violated section 4903 subdivision (c), because its analysis contradicted several conclusions in the 2017 habeas decision. We disagree.

The Board's decision states it is accepting these conclusions. Specifically, the decision identifies as binding the habeas court's conclusions that: (1) " '[t]he only item *found* on [Tarkington] that tied him to the robbery was $200 in cash' " (italics added); (2) " 'the shirt and towel were not merely cumulative pieces of evidence that tied Tarkington to the robbery without viable explanation as to how they came into his possession; they were the only items that do so' "; (3) " 'no DNA or other physical evidence put Tarkington either in the bank or getaway car; that the DNA of two other people—but not Tarkington—were [*sic*] found on the nylon stocking containing the $59 in coins found in the back of his car' "; (4) " 'the case against Tarkington has been reduced to the false name he gave to law enforcement when pulled over—unsurprising given he was still on federal supervised release—and the alleged similarities between Tarkington's height, build, and skin color to one of the robbers' "; (5) " 'Tarkington has a dark complexion, is about 5 feet 11 inches tall, does not have a medium build, weighing about 200 pounds in late 2005' "; and (6) " 'Detective Brown's testimony was "greatly exaggerated." ' " (Quoting 2017 habeas decision.)

Nothing in the Board's decision is inconsistent with these conclusions. Appellants argue the Board ignored a finding that

16

Tarkington did not match the bank tellers' descriptions of the robbers. But the habeas court made no such broad finding. Rather, it concluded that the admissible inculpatory evidence at trial included "the alleged similarities between Tarkington's height, build, and skin color to one of the robbers." The court added a footnote contrasting Tarkington's appearance with certain tellers' descriptions of the robbers to the FBI. But the 2017 habeas decision does not conclude that none of the tellers' descriptions in the record match Tarkington. Indeed, it stops short of expressly concluding the FBI witnesses' identifying statements do not match Tarkington.

Appellants argue that the 2017 habeas decision also required the Board to "acknowledge Detective Brown's misconduct." But the habeas court did not find Brown engaged in misconduct. Nor did it make any adverse credibility finding about him. Rather, it concluded that his testimony regarding the smell of pepper spray on the shirt and towel was "greatly exaggerated." But Tarkington's trial counsel and the trial judge both stated that these items exuded an odor. In any case, the Board did not rely on Brown's testimony regarding the smell on the shirt and towel.

Appellants argue the 2017 habeas decision's reference to Tarkington having a "viable" explanation for the red-stained money in his pants and car—that Allen obtained the money by selling a stolen car and gave Tarkington $200 in exchange for a ride—required the Board to accept that explanation as true. But describing an explanation as "viable" is not tantamount to finding it true. Moreover, the habeas court based its comment on the evidence before it during the habeas proceedings. The Board was assessing a different, larger body of evidence at the

17

section 4900 hearing, including a new declaration from Allen in which he claims to have obtained the red-stained money in an entirely different way than what he testified to at trial. (See *Gonzales, supra*, 98 Cal.App.5th at p. 444.)

Appellants also argue the Board violated section 4903 by considering Tarkington's prior conviction. The 2017 habeas decision does not reach any conclusions about the prior conviction evidence. It does, however, reference the holding in the 2008 *direct* appeal that the lower court erred by admitting the evidence at trial. Because Tarkington did not testify at trial, this 2008 holding does not speak to whether the trial court could have properly admitted the prior conviction to impeach Tarkington's credibility as a witness. By contrast, Tarkington's credibility as a witness *was* at issue before the Board, because Tarkington's habeas testimony was in evidence at the section 4900 hearing. The Evidence Code permits evidence of a felony conviction "[f]or the purpose of attacking the credibility of a witness." (See Evid. Code, § 788; *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925 ["California courts have repeatedly held that prior convictions for burglary, robbery, and other various theft-related crimes are probative on the issue of the defendant's credibility"].) Thus, the Board did not violate section 4903 or otherwise abuse its discretion by considering Tarkington's prior conviction as relevant to his credibility as a witness.

Finally, appellants imply the Board may not rely on evidence from the trial record because the 2017 habeas decision characterizes the admissible evidence against Tarkington at trial as a "paucity" and "scant." But when "a habeas corpus court summarizes the trial evidence or otherwise comments that some or all of the evidence is 'weak' as part of its rationale for

18

concluding that the evidence was insufficient," "that summary or commentary itself [is not] a 'factual finding' " under section 4903. (*Gonzales, supra*, 98 Cal.App.5th at p. 447.) Moreover, the court's view that the admissible evidence at trial was insufficient to prove guilt beyond a reasonable doubt does not preclude the conclusion that a different and larger body of evidence at the section 4900 hearing established Tarkington's involvement in the robbery by a lower standard of proof.

The Board's decision is consistent with the 2017 habeas decision.[8]

### C.     Substantial Evidence Supports the Board's Decision

Appellants challenge the sufficiency of the evidence to support the Board's findings and decision. Because our review is for substantial evidence, "we do not 'weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence.' " (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1073 (*Doe*).) " '[The administrative agency's] findings come before us "with a strong presumption as to their correctness and regularity." [Citation.] . . . [¶] We are required to accept all evidence which supports the successful party, disregard the

_____

[8] We thus need not and do not address respondents' argument that these conclusions are not findings of fact or credibility determinations of the type section 4903, subdivision (c) requires the Board to accept. (*Gonzales, supra*, 98 Cal.App.5th at p. 447 [section 4903, subdivision (c) does not require the Board to accept the habeas court's "summar[ies] of, observations about, and characterizations of the trial record when the habeas court is . . . making a legal assessment, after reviewing the static record from the trial proceedings, about whether that record contains sufficient evidence to support a conviction"].)

contrary evidence, and draw all reasonable inferences to uphold the verdict.' " (*Id.* at pp. 1073-1074.) " 'Inferences may constitute substantial evidence as long as they are the product of logic and reason rather than speculation or conjecture.' " (*Holmes, supra*, 239 Cal.App.4th at p. 1406.)

Appellants address several items of evidence the Board cited as supporting that Tarkington committed the robbery, arguing each individually does not constitute substantial evidence of that conclusion. But we do not assess each item of evidence individually. Our task is to determine whether a reasonable factfinder could conclude the complete body of evidence supports the Board's findings. (See *Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1490 (*Do*).)

Appellants' arguments against specific evidence on which the Board relied do not establish error under the substantial evidence standard for other reasons as well. Appellants argue that Tarkington's trial counsel's testimony is not credible because Tarkington's ineffective assistance allegations gave her a motive to lie. But all information suggesting this possible ulterior motive was before the Board when it deemed her testimony credible.

Appellants argue the Board "cherry-picked favorable facts" and evidence to incriminate Tarkington while "ignoring" those tending to exonerate him. For example, they argue it relied on certain teller descriptions of the robbers while ignoring others, ignored the forensic expert testimony that the shirt and towel did not contain MAAQ, and disregarded evidence appellants contend establishes Brown framed Tarkington. The record, however, also contains evidence explaining, contradicting, or undermining the credibility of the exculpatory evidence appellants claim the Board

20

ignored.  We do not reverse a decision because the factfinder could have reasonably weighed the evidence in a different way. Rather, "[o]nly if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence." (*Do, supra*, 216 Cal.App.4th at p. 1490.)  In the context of the entire record, the Board was not unreasonable in concluding the exculpatory evidence appellants identify did not outweigh the clear and convincing evidence the AG presented.

## DISPOSITION

The order is affirmed.  The parties shall bear their own costs on appeal.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

WEINGART, J.

M. KIM, J.

21